## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| MONTE-JANE MITTEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CIVIL ACTION |
| NOVARTIS PHARMACEUTICALS | ) CASE NO. |
| CORPORATION, | ) |
| | ) |
| Defendant. | ) |

## <u>COMPLAINT</u>

COMES NOW, Plaintiff Monte-Jane Mitten, by and through undersigned counsel, and for her Complaint against Defendant Novartis Pharmaceuticals Corporation ("Defendant" or "Novartis"), respectfully states and alleges as follows:

### I.    NATURE OF THE ACTION

1.    This is an action for employment discrimination brought to secure legal and equitable relief for injuries Plaintiff sustained as a result of Defendant's discrimination in violation of The Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and The Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*. ("ADEA").

2.    Defendant unlawfully discriminated against Plaintiff on the basis of her disability and age, creating an intimidating, offensive, and hostile work environment that affected the terms and conditions of Plaintiff's employment.

3.    Plaintiff seeks injunctive and declaratory relief, compensatory damages, punitive damages, liquidated damages, and reasonable attorneys' fees and costs as remedies for Defendant's violation of her rights.

## II.    PARTIES

4.      Plaintiff Monte-Jane Mitten is a citizen of Kansas who worked for Novartis as a Sales Representative in Kansas from 2006 until she was terminated in August 2018.

5.      Defendant Novartis Pharmaceuticals Corporation is a New Jersey corporation with its principal place of business at One Health Plaza, East Hanover, New Jersey 07936.

6.      At all times relevant herein, Defendant had at least 15 employees, and was therefore an "employer" within the meaning of the ADA and the ADEA.

7.      Novartis is a corporation and can act only through its officers and employees, and the conduct of an officer or employee acting within the scope of his or her employment or authority is the conduct of the corporation.

8.      Novartis is liable for the acts of its officers, employees and agents, including its in-house attorneys and outside counsel.

9.      Plaintiff is informed, believes, and thereon alleges, that at all times relevant herein, managers Walton and Baker, and the attorneys referenced below, were responsible for the discrimination occurrences and injuries alleged in this Complaint.

## III.    JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over Plaintiff's federal law claims under 28 U.S.C. § 1331, as this case involves questions of federal law.

11.     This Court is a proper venue under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because Defendant is subject to this Court's personal jurisdiction by maintaining facilities and business operations in this District, and because the events and unlawful employment practices giving rise to this action occurred in this District.

## IV.     EXHAUSTION OF ADMINISTRATIVE REMEDIES

12.     Plaintiff timely filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") pursuant to 42 U.S.C. § 2000e-5(b), a copy of which is attached hereto as Exhibit 1.

13.     On or around September 30, 2019, the EEOC issued Plaintiff a Notice of Right to Sue, a copy of which is attached hereto as Exhibit 2.

14.     Plaintiff has complied with all administrative prerequisites to bringing this lawsuit and has timely filed this action.

## V.     FACTUAL BACKGROUND

15.     Plaintiff was employed by Novartis from September 2006 until August 2018 as a Sales Representative. Plaintiff sold Xolair, generic Omalizumab, a drug used for allergic asthma and chronic idiopathic urticaria.

16.     At the time Defendant hired Plaintiff, she was 55 years of age. At the time of this filing, she is 68 years of age.

17.     At all times during her employment, Plaintiff more than adequately performed her employment duties. She received excellent performance reviews and was awarded bonuses based on her superior performance.

18.     As of March 2018, Plaintiff had a substantial salary based on her track record of strong sales. In addition, Defendant gave Plaintiff bonuses and benefits.

19.     Plaintiff won several sales awards, including the MVP Award in 2009 and 2014; The GM Award in 2009; the President's Club Award for Sales Excellence in 2013, 2015 and 2017; and the Cornerstone Award for Top Sales and Performance Excellence in 2017.

20.     Plaintiff's manager also appointed her to the Novartis Ethics and Compliance Committee for six years, assuring full compliance with Novartis's Code of Conduct for Plaintiff and her team.

21.     Prior to Plaintiff's termination in August 2018, she had never received a single reprimand or any disciplinary action from Defendant.

22.     Plaintiff began her employment with Defendant as a Sales Representative making approximately $90,000 in base salary. Around 2008 or 2009, she was promoted to Senior Respiratory Sale Specialist with a base salary of approximately $100,000.00. Around 2015, she was again promoted, this time to Executive Respiratory Sales Specialist with a base salary of approximately $110,000.00.

23.     Plaintiff's 2018 salary of $161,000.00 was greater than her position's posted cap of $140,000.00 and higher than most Novartis managers.

24.     During the times relevant to this action, Plaintiff worked from her home in Lenexa, Kansas and visited doctors throughout the region, including throughout the state of Kansas.

25.     In or around 2010, Walton asked Plaintiff when she was going to retire.

26.     In or around January 2012, Plaintiff was on medical disability leave due to breast cancer, which involved surgery and chemotherapy.

27.     In or around April 2012 while still undergoing chemotherapy for her breast cancer, Plaintiff sustained a broken right tibia that prevented her from driving, an essential job function and requirement of her position. She was able to return to work in or around July 2012.

28.     In or around 2014, Baker asked Plaintiff when she was going to retire

29.     On or about March 9, 2018, Plaintiff fell down the stairs, suffering two broken vertebrae in her neck. Her doctor prescribed a hard neck brace and prohibited her from driving.

30.     Plaintiff took short term disability on or about March 9, 2018. Her broken neck substantially limited her ability to perform manual tasks, walk, lift, sit, drive, and work.

31.     As a Sales Representative, one of Plaintiff's primary job responsibilities was to travel to hospitals throughout the Midwest to visit doctors and staff. After she broke her vertebrae, she was not able to sit for long periods which prevented her from driving long distances.

32.     In or around June 2018, Plaintiff underwent surgery when her vertebrae were not healing as expected, which prolonged her leave of absence from work.

33.     On or about June 14, 2018, less than a week after her surgery, Plaintiff received an email from Defendant's attorney demanding she fly to California for a meeting. She explained she was on medical leave and unable to attend.

34.     Plaintiff was unable to return to work until on or about August 20, 2018.

35.     On or about August 17, 2018, three days before her scheduled return to work, Plaintiff received a text message from Baker asking Plaintiff to meet Baker for coffee at 8:30 a.m. on August 21, 2018.

36.     On or about August 20, 2018, Plaintiff returned to work as scheduled. That very morning, she received a text message from Baker that Defendant's Human Resources Department would be calling her that morning. Plaintiff assumed the call would be to discuss her transition back to the sales force.

37.     However, the call Plaintiff received the morning she returned to work on or about August 20, 2018 was not from Defendant's HR department, but rather from three of Defendant's attorneys interrogating her about an alleged infraction Plaintiff committed more than two years earlier in the spring of 2016.

38.     Two years earlier, in the spring of 2016, Plaintiff received a text message from another Novartis Sales Representative, Karyn DelRosso. Ms. DelRosso included a link to send to interested dermatologists and/or mid-level providers so they could register to attend a Dermatology Clinical Society semi-annual two-day event. The event was directed towards dermatologists and other dermatology related health care providers and included a number of speakers and presentations.

39.     Shortly after receiving the text from Ms. DelRosso, Plaintiff shared the link with Andy Dean, a physician's assistant in her territory. Plaintiff did not share the link with anyone other than Dean.

40.     The presentations at the semi-annual Dermatology Clinical Society meetings included dermatologists demonstrating aesthetic facial fillers. During various meetings, different dermatologists asked Plaintiff if she would be willing to assist them in their presentations of injections. She agreed to do so as a favor to the dermatologists who were her friends and colleagues. She did not offer anything to receive the injections, no dermatologist received a monetary benefit by asking Plaintiff to patient during a presentation, and in no way was Plaintiff's receipt of during dermatological presentations related to her sharing a link with Dean to register for the 2016 semi-annual dermatology event.

41.     According to Defendant's counsel during the phone call on or about August 20, 2018, Plaintiff's alleged infraction was using her corporate email address to send the link provided by Ms. DelRosso to Dean. Defendant's counsel also implied that during the phone call Plaintiff had offered something of value to Dean on behalf of Novartis by sharing the link to the event, but after Dean thanked her for the information, all she said was that she hoped he enjoyed the event and to keep her in the loop.

42.    On or about August 21, 2018, Plaintiff met Baker at a coffee shop in the morning. Unbeknownst to Plaintiff, Baker was accompanied by Defendant's Human Resources Director. At the meeting, the Human Resources Director terminated Plaintiff for allegedly failing to comply with the Novartis Code of Conduct regarding providing gifts or items of value to healthcare providers.

43.    Ironically, throughout Plaintiff's employment with Novartis, the company encouraged its sales representatives, including Plaintiff, to invite attendees and key opinion leaders to attend its Dermatology Clinical Society meetings, as well as other events including Novartis's Product Theater dinners at national conventions of the American Academy of Allergy, Asthma, and Immunology (AAAAI); CHEST - The American College of Chest Physicians; and the American College of Allergy, Asthma and Immunology (ACAAI). In fact, Defendant gave its sales representatives invitations to hand out to important and/or potential prescribers to dinners at its Product Theater events.

44.    To the best of Plaintiff's knowledge and belief, Novartis has specifically reached out to Dr. Jim DelRosso, Dr. Darrell Riegel, and other key opinion leaders to invite certain important physicians to attend Novartis Product Theaters at national conventions.

45.    Also ironically, Defendant appointed Plaintiff to serve on its Ethics and Compliance Committee for several years. As a committee member, Plaintiff knew the proper codes of conduct and knew it was not against policy to invite attendees to Dermatology Clinical Society meetings.

46.    To the best of Plaintiff's knowledge and belief, Defendant's counsel also questioned three other sales representatives and a manager regarding sharing links with medical professionals to attend the 2016 semi-annual Dermatology Clinical Society meeting.

47.     Three of the four other employees interviewed were not terminated. One resigned. All of them were younger than Plaintiff.

48.     Because of the span of two years' time between Plaintiff's alleged infraction and her termination, and because of the absence of a true infraction, Defendant's stated reasons for terminating Plaintiff were pretextual. Defendant terminated her because of her age and disability.

## VI.     CLAIMS FOR RELIEF

### COUNT I
### Disability Discrimination in Violation of
### The Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA")

49.     Plaintiff restates and re-alleges the above paragraphs as if fully set forth in this cause of action.

50.     Plaintiff is a qualified individual as defined in the ADA in that she was an individual who, with or without reasonable accommodation, could perform the essential functions of her employment as a Sales Representative.

51.     Defendant is a covered entity and an employer as defined in the ADA in that it is engaged in an industry affecting commerce that has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

52.     Plaintiff suffered a broken neck while employed by Defendant and continued to suffer pain and limitations up to and including the date of her termination of employment.

53.     Plaintiff's broken neck constitutes a disability as defined in that ADA in that it substantially limited one or more of her major life activities. Because of her broken vertebrae, Plaintiff could not drive or lift. Driving and lifting are all major life activities.

54.     Plaintiff informed Defendant's personnel of her broken vertebrae.

55.     Defendant improperly contacted her during her medical leave.

56.     Defendant terminated Plaintiff upon her return from medical leave.

57.     Plaintiff's disability was a factor in her discrimination and hostile work environment; all performance issues alleged by Defendant were merely pretext. Defendant terminated Plaintiff because of her disability in violation of the ADA.

58.     Defendant's discrimination of Plaintiff affected a term, condition and/or privilege of her employment.

59.     Defendant's discrimination of Plaintiff adversely affected her opportunities and status of her employment.

60.     Defendant utilizes standards, criteria, and/or methods of administration that perpetuate the discrimination of others who are subject to common administrative control.

61.     Defendant's discrimination of Plaintiff based on her disability denied her employment and benefits.

62.     As a direct, legal, and proximate result of this discrimination, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

63.     Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on her disability.

64.     Plaintiff is entitled to her reasonable attorneys' fees and costs of suit.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against Defendant for economic damages, including, but limited to: back pay, lost benefits, front pay, injunctive relief, compensatory damages, punitive damages, for reasonable attorneys' fees and costs incurred herein, for pre-and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as this Court deems just and proper.

**COUNT II**
**Age Discrimination in Violation of**
**The Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*. ("ADEA")**

65.     Plaintiff restates and re-alleges the above paragraphs as if fully set forth in this cause of action.

66.     Plaintiff was 67 years old at the time Defendant terminated her employment, and therefore a member of the protected class of age in that she was at least 40 years of age.

67.     Defendant is an employer as defined in the ADEA in that it is engaged in an industry affecting commerce that has 20 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

68.     Plaintiff was subjected to age discrimination and/or subjected to a hostile work environment at the hands of Defendant and/or Defendant's agents and subordinates, in that Defendant permitted Walton, Baker and others to discriminate against her because of her age.

69.     Plaintiff was also subjected to age discrimination and/or subjected to a hostile work environment at the hands of Defendant and/or Defendant's agents and subordinates in that Defendant replaced Plaintiff with a younger employee between the age of 40 and 45.

70.     Defendant did not terminate younger employees for the performance issues for which Plaintiff was allegedly terminated.

71.     Plaintiff's age was a factor in her discrimination and hostile work environment; all performance issues alleged by Defendant were merely pretext.

72.     The age discrimination materially affected a term, condition, or privilege of Plaintiff's employment because the conduct was continuous, outrageous, humiliating, and unreasonably interfered with Plaintiff's ability to perform the functions of her employment.

73.     By not taking any action to stop Plaintiff's supervisors from continuing their ongoing discrimination and harassment against Plaintiff, Defendant ratified, authorized and/or condoned this conduct.

74.     Defendant knew of the discrimination and harassment, and failed to take appropriate action, or any remedial action whatsoever.

75.     Plaintiff was discharged from her job.

76.     As a direct and proximate result of Defendant's actions and/or omissions, Plaintiff has been deprived of income, as well as other monetary and non-monetary benefits.

77.     As a further direct and proximate result of Defendant's actions and/or omissions, Plaintiff has suffered a loss of self-esteem, humiliation, emotional distress, mental anguish, pain and suffering, and related compensatory damages and injuries.

78.     As shown by the foregoing, Defendant's conduct was willful, wanton, and malicious, and showed complete indifference to or conscious disregard for the rights of others, including the rights of the Plaintiff, thus, justifying an award of punitive damages in an amount sufficient to punish Defendant or to deter them and other companies from such conduct in the future.

79.     Plaintiff is entitled to her reasonable attorneys' fees and costs of suit.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against Defendant for economic damages, including, but limited to: back pay, lost benefits, front pay, injunctive relief, compensatory damages, punitive damages, for reasonable attorneys' fees and costs incurred herein, for pre-and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as this Court deems just and proper.

## VII.   PLAINTIFF'S DEMAND FOR JURY TRIAL

Plaintiff hereby requests and demands a trial by jury on all issues so triable.

## VIII.   DESIGNATED PLACE OF TRIAL

Plaintiff hereby designates Kansas City, Kansas as the place of trial in this matter.

Dated:        December 29, 2019                    Respectfully submitted,


 _/s/ Jack McInnes_____
Jack McInnes, Bar No. 21898
Pamela Nagel Jorgensen, Bar No. 27716
MCINNES LAW LLC
1900 West 75th Street, Suite 120
Prairie Village, KS 66208
Telephone: (913) 220-2488
Facsimile: (913) 273-1671
jack@mcinnes-law.com
pam@mcinnes-law.com

ATTORNEYS FOR PLAINTIFF