**In the United States District Court
for the District of Kansas**

————————————

Case No. 19-cv-02782-TC-GEB

————————————

MONTE-JANE MITTEN,

*Plaintiff*

v.

NOVARTIS PHARMACEUTICALS CORP.,

*Defendant*

————————————

**MEMORANDUM AND ORDER**

Plaintiff Monte-Jane Mitten is a former employee of Defendant Novartis Pharmaceuticals Corporation. Mitten alleges that Novartis terminated her on the basis of her age and disability in violation of federal law. Doc. 102 at ¶ 4.a. Novartis filed a motion for summary judgment on all of Mitten's claims.[1] Doc. 104. Novartis's motion is granted.

## I

### A

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim's resolution. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over those material facts

---

[1] Novartis filed counterclaims against Mitten on various contract and quasi-contract theories, all related to Mitten's alleged improper conduct while employed at Novartis. Doc. 102 at ¶ 4.c. Novartis did not move for summary judgment on its own counterclaims.

are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(d). To determine whether a genuine issue of fact exists, the Court views all evidence and draws all reasonable inferences in the light most favorable to the nonmoving party. *See Allen v. Muskogee*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record as a whole, *see Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

**B**

Novartis terminated Mitten from her position as a sales representative. She contends that the termination violated two federal laws: the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.*, and the Americans with Disabilities Act, as amended (ADAAA), 42 U.S.C. § 12101, *et seq.* Novartis argues that it terminated Mitten and others upon learning that these employees violated its anti-bribery and conflicts-prevention policies. The following summary identifies the material facts that are not in genuine dispute or, where disputed with competent evidence, viewed in the light most favorable to Mitten.

**1.** Mitten was over 40 both when the pharmaceutical company Novartis hired her and when it fired her 12 years later. Doc. 105 at ¶¶ 1,

25; Doc. 110 at 8, ¶ 1; 11, ¶ 25. [2] She worked as a sales representative for Novartis. Doc. 105 at ¶ 1; Doc. 110 at 8, ¶ 1.

In 2012, Mitten took short-term disability leave from Novartis to receive treatment for cancer and a broken tibia. Doc. 105 at ¶ 9; Doc. 110 at 8, ¶ 9. This leave lasted roughly five months, after which Mitten returned to work without accommodation. Doc. 105 at ¶¶ 9–10; Doc. 110 at 8, ¶¶ 9–10. She reports no negative comments or adverse consequences from Novartis related to her leave. Doc. 105 at ¶¶ 13–15; Doc. 110 at 8–9, ¶¶ 13–15 (admitting that Mitten has no personal knowledge or evidence of discriminatory remarks). Nor does she claim that she experienced any trouble returning to work. Doc. 105 at ¶ 10; Doc. 110 at 8, ¶ 10.

In March 2018, six years later, Mitten took another short-term leave for five months—this time for a broken vertebra in her neck. Doc. 105 at ¶ 11; Doc. 110 at 8, ¶ 11. In August 2018, Mitten was medically cleared to return to work full time with no restrictions. Doc. 105 at ¶ 12; Doc. 110 at 9, ¶ 12. Upon her return, she did not request any accommodations from Novartis. Doc. 105 at ¶ 12; Doc. 110 at 9, ¶ 12.

Until 2018, Mitten had a spotless employment record at Novartis. She had never been disciplined, Doc. 105 at ¶ 5; Doc. 110 at 8, ¶ 5, nor had she complained of any discrimination or harassment at Novartis, Doc. 105 at ¶¶ 15, 30; Doc. 110 at 9, ¶ 15; 11, ¶ 30. She was a three-year member of an ethics and compliance committee, and there is no indication that her performance had been anything less than satisfactory. Doc. 105 at ¶ 6; Doc. 110 at 8, ¶ 6.

**2.** In February 2018, Novartis received an anonymous tip implicating Mitten in wrongdoing. Doc. 105 at ¶ 58; Doc. 110 at 19–20, ¶ 58 (controverted in irrelevant part).[3] Novartis investigated the allegations,

---

[2] All references to the parties' briefs are to the page numbers assigned by CM/ECF.

[3] Mitten denies several of Novartis's facts without appropriate record citation. That is insufficient. Fed. R. Civ. P. 56(c); D. Kan. Rule 56.1(b), (d)–(e). Only those facts legitimately controverted in accordance with local and federal rules or properly supported as the rules require are noted here. *See* Rule 56(c); D. Kan. Rule 56.1(a).

prepared a report, and recommended disciplinary action against each employee involved. Doc. 105 at ¶¶ 58–113; Doc. 110 at 19–28, ¶¶ 58–113.

**a.** The anonymous complainant claimed that one of Mitten's coworkers, Karyn DelRosso, had engaged in unlawful business practices and had involved other unnamed sales representatives. Doc. 105 at ¶¶ 58–64; Doc. 110 at 19–20, ¶¶ 58–64. The core allegation was that DelRosso had offered "scholarships" to encourage health care providers to attend her husband's medical conferences. Doc. 105 at ¶¶ 58–64; Doc. 110 at 19–20, ¶¶ 58–64. These transactions, the complainant alleged, violated both federal law and Novartis's policies against bribery and conflicts of interest. Doc. 105 at ¶ 58; Doc. 110 at 19–20, ¶ 58. The complainant offered documentary proof, which Novartis reviewed and found credible. Doc. 105 at ¶¶ 58–65; Doc. 110 at 19–20, ¶¶ 58–65.

Novartis's Business Practices Office began an investigation. Doc. 105 at ¶¶ 60–61, 65; Doc. 110 at 19–20 ¶¶ 60–61, 65. Within a month, it had assigned the case to Novartis's Global Security Department, which assigned Matthew Thomas as the lead investigator. Doc. 105 at ¶¶ 65, 68; Doc. 110 at 20–21, ¶¶ 65, 68. Thomas identified potential witnesses and requested a forensic search of DelRosso's work email, which revealed emails between DelRosso and sales representative Deborah Bower. Doc. 105 at ¶¶ 71–74; Doc. 110 at 21, ¶¶ 71–74. Around the same time, in March 2018, Mitten went on her short-term disability leave. She had not yet been named in the investigation. *See* Doc. 105 at ¶ 64; Doc. 110 at 20, ¶ 64.

Novartis spent the next several months interviewing 15 witnesses and drafting an investigative report. Doc. 105 at ¶¶ 75–77, 92; Doc. 110 at 21, ¶¶ 75–77 & 23, ¶ 92. Bower's interview was conducted in person and lasted roughly 90 minutes. Doc. 110 at ¶ 55; Doc. 110 at 41. She stated that Mitten had been involved, despite Mitten's previous comment to Bower that the DelRosso transactions "seemed shady." Doc. 105 at ¶¶ 85–86. Investigating based on Bower's interview,[4]

---

[4] Mitten objects to consideration of Bower's statement to Thomas, arguing that it is hearsay. Doc. 110 at 22, ¶¶ 85–86. That objection is overruled because Bower's statement is not offered for its truth but rather for its "effect on the listener." *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434 (10th Cir. 1993); Fed. R. Evid. 801.

Novartis found in Mitten's emails a discussion with a healthcare provider, Andy Dean, in which Mitten answered Dean's questions about registration and travel arrangements for an upcoming Dr. DelRosso conference.[5] Doc. 105 at ¶¶ 90–91, 96–98; Doc. 110 at 22–24, ¶¶ 90–91, 96–98. Incorrectly expecting Mitten to return from leave the following day, Thomas, the lead investigator, contacted Mitten in June and asked to schedule an interview. Doc. 105 at ¶¶ 78–79; Doc. 110 at 21, ¶¶ 78–79. Mitten declined the interview by informing Thomas that she was still on leave and did not yet have a return date. Doc. 105 at ¶¶ 79–81; Doc. 110 at 21, ¶¶ 79–81.

**b.** Novartis produced its investigation report, dated August 3, 2018, reflecting its findings from email searches and 15 interviews, but not an interview with Mitten herself. Doc. 105 at ¶ 92; Doc. 110 at 23, ¶ 92. With regard to Mitten, it found three substantiated allegations against her: (i) a violation of the company gifts rules, (ii) a violation of conflict-of-interest rules for soliciting providers to attend Dr. DelRosso conferences, and (iii) a violation of conflict-of-interest rules for serving as a model in exchange for free Botox injections at Dr. DelRosso conferences. Doc. 105 at ¶¶ 94, 99; Doc. 110 at 23, ¶ 94 & 24–25, ¶ 99.

The report also concluded that four others had engaged in similar misconduct. It found that Karyn DelRosso and Bower, like Mitten, had violated the gifts rules and solicited providers. Doc. 105 at ¶¶ 94, 99; Doc. 110 at 23, ¶ 94 & 24–25, ¶ 99. And, like Mitten, two other representatives, Alexandra Reynolds and Barbara O'Brien, had violated Novartis's rules by serving as Botox models. Doc. 105 at ¶¶ 94, 99; Doc. 110 at 23, ¶ 94 & 24–25, ¶ 99. But neither Reynolds nor O'Brien had violated the gift or solicitation rules that Mitten, DelRosso, and Bower had. Doc. 105 at ¶¶ 94, 99; Doc. 110 at 23, ¶ 94 & 24–25, ¶ 99.

**c.** The investigation report went to an Internal Review Committee (IRC) for recommended actions. Doc. 105 at ¶ 102; Doc. 110 at 25, ¶ 102. The IRC consisted of six people with a diverse range of responsibility: Investigation Legal Counsel Adam Subervi, Employee

---

[5] Mitten acknowledges the email's existence but explains that it does not expressly acknowledge that Mitten knew Dean was going to receive a "scholarship" to cover his travel costs or that she had intended to broker such a scholarship. Doc. 110 at 24, ¶¶ 96–98.

Relations Lead Sherri Sims, Human Resources Lead Pedro Menendez-Majon, Ethics and Compliance Lead Nadya Babigian, Legal Lead Tricia Beckles, and Commercial/Medical Lead Karen McDougal. Doc. 105 at ¶ 103; Doc. 110 at 25, ¶ 103. Neither Mitten's direct supervisor nor the investigator assigned to her case was on the IRC. *See* Doc. 105 at ¶ 103; Doc. 110 at 25, ¶ 103.

The IRC convened on August 9, 2019, and issued recommendations of varying severity. Doc. 105 at ¶ 104; Doc. 110 at 26, ¶ 104. It recommended that Reynolds and O'Brien be coached and retrained, that Bower be terminated, and that Mitten be terminated pending an interview. Doc. 105 at ¶¶ 107–08; Doc. 110 at 26, ¶¶ 107–08. The IRC noted that DelRosso had taken early retirement during the investigation and was designated ineligible for rehire. Doc. 105 at ¶ 106; Doc. 110 at 26, ¶ 106. It also recommended that Novartis engage in team retraining and investigate any business relationship with Dr. DelRosso. Doc. 105 at ¶ 107; Doc. 110 at 26, ¶ 107.

These recommendations then went to the Respiratory Franchise business unit (where Mitten worked). Doc. 105 at ¶¶ 111–12. The head of that unit, Leverne Marsh, approved the recommendations in full, *id.*, although Mitten contends that Marsh lacked the discretion to do otherwise, Doc. 110 at 27–28, ¶¶ 111–12. Later that year, Novartis also reported the events to the Office of the Inspector General and terminated its business relationship with Dr. DelRosso. Doc. 105 at ¶¶ 159–60; Doc. 110 at 39, ¶¶ 159–60.

**3.** Mitten informed Novartis that she would return to work on August 20, 2018. Doc. 105 at ¶ 114; Doc. 110 at 28, ¶ 114. She came back that day with a full release from her physician, without any prescribed restrictions or any request to Novartis for an accommodation. Doc. 105 at ¶¶ 12, 116; Doc. 110 at 9, ¶ 12 & 28, ¶ 116.

That same day, Novartis interviewed Mitten by phone. Doc. 105 at ¶¶ 117–18; Doc. 110 at 29, ¶¶ 117–18. It told her to expect a call but not what its subject would be. Doc. 105 at ¶ 117; Doc. 110 at 29, ¶ 117 & 54, ¶ 80; Doc. 118 at 41. The parties' accounts vary, but the call lasted between 10 and 30 minutes, during which they discussed Mitten's relationship with the DelRossos and her communication with Dean. Doc. 110 at 56–57, ¶¶ 94–100; Doc. 118 at 41, 57. Mitten did not admit any wrongdoing but acknowledged that she could "absolutely" see the problem with how her conduct appeared in hindsight. Doc. 105 at ¶ 121; Doc. 110 at 30, ¶ 121.

Based on the call, Thomas concluded in a supplemental report that Mitten had improperly facilitated a gift to a healthcare provider while knowing her conduct was impermissible. Doc. 105 at ¶ 119; Doc. 110 at 29, ¶ 119. He also noted that she was "not being forthcoming" during her interview. Doc. 117-1 at 27. Mitten continues to deny any misconduct, arguing that she did not intend to benefit from the transaction and that her inconsistent statements during the interview were ordinary lapses of memory. Doc. 110 at 54, ¶ 78 & 56, ¶ 91; Doc. 118 at 41. She also claims that the interview was perfunctory yet "rapid fire," that Thomas was merely seeking to confirm prior conclusions, that she was not allowed to tell her side of the story, that she could have implicated other sales representatives but was never asked to do so, and that she could have provided no information during the interview which would have prevented her termination. Doc. 110 at 40, ¶ 6 & 57–58, ¶¶ 100, 106–09.

Novartis terminated Mitten on August 21, 2018, the day after she returned to work. Doc. 105 at ¶ 146; Doc. 110 at 37, ¶ 146. The HR lead from the IRC informed Mitten of their decision, and her direct supervisor was also present at the termination meeting. Doc. 105 at ¶ 147–48; Doc. 110 at 37, ¶ 147–48.

**4.** Mitten filed an Equal Employment Opportunity Commission (EEOC) charge against Novartis in April 2019. Doc. 105 at ¶ 16; Doc. 110 at 9, ¶ 16.[6] While she acknowledged that Novartis's stated reason for terminating her was her code of conduct violation, Mitten claimed Novartis was merely attempting to hide its true reasons for firing her: her age and disability. Doc. 105-2 at 88, ¶ XI. Five months later, the EEOC issued her a Notice of Right to Sue. Doc. 20 at ¶ 13.

Following the EEOC process, Mitten filed this case in federal court to pursue her claims under the ADEA and the ADAAA. Doc. 20. Novartis then filed counterclaims, alleging state-law breach-of-contract claims against Mitten arising out of certain employee incentive contracts. Doc. 23.

As to the ADEA claim, Mitten claims that the other representatives that Novartis interviewed were "able bodied;" however, there is no evidence in the record as to whether they had disabilities of which

---

[6] Novartis does not contest the exhaustion of administrative remedies or timeliness of claims related to Mitten's 2018 termination, *see* Doc. 105 at 39.

Novartis was aware. *See, e.g.*, Doc. 110 at 41, ¶ 7. Mitten's declaration makes passing reference to her able-bodied peers: "I further believe that entire process of not being interview[ed] prior to the recommendation that she [*sic*] be terminated, while all other able-bodied employees were interviewed, was discriminatory in nature…. [M]y able-bodied peers received lengthy, in-person interviews in conjunction with Novartis' investigation. I did not receive the same …." Doc. 111-6 at ¶¶ 5–6. But as Novartis points out, Mitten has not provided evidence to show whether these peers were or were not within an ADAAA-protected class. *See* Doc. 111-6. In fact, despite Mitten's characterization of "all other" employees as "able-bodied," DelRosso, like Mitten, had been on short-term disability leave for a large portion of Novartis's investigation, beginning May 2018. Doc. 105 at ¶ 83; Doc. 110 at 22, ¶ 83.

Mitten admits that she has no knowledge, and there is no evidence, of any discriminatory remarks or actions related to her own alleged disability or short-term disability leaves. Doc. 105 at ¶¶ 15, 30; Doc. 110 at 9, ¶ 15 & 11, ¶ 30. The only problematic conduct to which Mitten points is Novartis's decision to terminate her. *See generally* Doc. 110.

But as to age, Mitten claims that she was asked by two different supervisors—once in 2010 and once in 2014—when she planned to retire. Doc. 105 at ¶¶ 18–19; Doc. 110 at 10, ¶¶ 18–19. Mitten was born in 1951. In the first instance, her supervisor was Brad Walton, who was born in 1953, just two years after Mitten. Doc. 105 at ¶¶ 3, 26; Doc. 110 at 8, ¶ 3 & 11, ¶ 26. In the later instance, her supervisor was Jeanne Baker, who was born in 1962. Doc. 105 at ¶¶ 4, 28; Doc. 110 at 8, ¶ 4 & 11, ¶ 28.

Both at the time of her firing and in its EEOC position statement, Novartis claimed that Mitten had violated the Novartis Conflicts of Interest Policy and its Global Anti-Bribery and Gifts Policy.[7] Doc. 105 at ¶ 145; Doc. 110 at 36, ¶ 145 & 61, ¶ 128; Doc. 118 at 41. In the course of this litigation, Novartis has also claimed that Mitten's conduct violated its US Anti-Bribery and Gifts Policy (which the parties sometimes call the "Compliance Navigator" policy, for the internal system on which it is located). *See* Doc. 118 at 59–60. Novartis claims

---

[7] There is no dispute that Mitten had access to these policies and that Novartis had trained her on them. Doc. 105 at ¶¶ 31–35; Doc. 110 at 11–13, ¶¶ 31–35.

that its decision to terminate Mitten was unrelated to her age or her disability status but was solely based on her policy violations. Doc. 105 at 5–6.

Novartis filed a motion for summary judgment on Mitten's claims, but not on its own counterclaims. Doc. 104. Only the parties' positions and evidence with respect to Mitten's claims under the ADEA and the ADAAA will therefore be considered.

## II

Novartis's motion for summary judgment is granted. With regard to her ADEA claim, Mitten has failed to demonstrate pretext. And with regard to her ADAAA claim, she has failed to show even a prima facie case.

## A

Mitten alleges that Novartis discriminated against her on the basis of her age and disability.[8] Lacking any direct evidence of discrimination,[9] her circumstantial evidence is measured against the *McDonnell Douglas* burden-shifting framework. *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1279 (10th Cir. 2010); *see also Sanders v. Sw. Bell Tel., L.P.*,

---

[8] Mitten's summary judgment papers include stray remarks about hostile work environment and retaliation claims or theories. Doc. 110 at 81, 83-84. These claims are not considered here because the Pretrial Order preserves only her two discrimination claims and does not mention retaliation, harassment, or hostile environment. Doc. 102 at ¶ 4.a.; *see also Leathers v. Leathers*, 856 F.3d 729, 760 (10th Cir. 2017) (holding that claims that are not included in the pretrial order are normally waived).

[9] Mitten claims she has direct evidence of age discrimination because two of her managers asked, years before her termination, when she intended to retire. Doc. 110 at 85. If she did have direct evidence, the *McDonnell Douglas* burden-shifting analysis would be unnecessary. But further "inference[s] or presumption[s]" are required to conclude from those comments that Novartis, years later, terminated Mitten based on discrimination. *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007); *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 855 (10th Cir. 2007). More importantly, neither speaker was a decisionmaker in Mitten's termination. *See McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998); *see also Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994). As a result, all of Mitten's allegations will be viewed as circumstantial evidence of discrimination.

544 F.3d 1101, 1105 (10th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

The particulars of the inquiry differ based on the law at issue and the nature of the discriminatory act, but the general framework remains the same. First, the plaintiff "bears the initial burden of setting forth a prima facie case of discrimination." *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir. 1998). To do so, the plaintiff must show that "she is a member of the class protected by the ADEA; she suffered an adverse employment action; she was qualified for the position at issue; and she was treated less favorably than others not in the protected class."[10] *Jones*, 617 F.3d at 1279 (cleaned up). If the plaintiff makes a valid prima facie case, the burden then shifts to the employer, who must give a legitimate, nondiscriminatory reason for its employment decision. *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). And if the employer succeeds, "the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Id.* (quoting *Randle v. City of Aurora*, 69 F.3d 441, 452 (10th Cir. 1995)) (internal quotation marks omitted). As part of that inquiry, the plaintiff must show that her age was one of the reasons for the employer's action. *Jones*, 617 F.3d at 1277–1278. Only when the plaintiff adequately demonstrates pretext does she get "over the hurdle of summary judgment." *Id.*

### B

Novartis is entitled to summary judgment on Mitten's ADEA claim. Although Mitten has a valid prima facie case of age discrimination, Novartis has adequately shown that it terminated her for

---

[10] There is a more particularized framing of this initial burden that the Tenth Circuit applies when, as here, the employee is terminated. *See generally Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1056 (10th Cir. 2020) (quoting *Adamson v. Multi Cnty. Diversified Servs., Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008)). But neither party addresses that formulation or offers arguments as to how it would apply. Doc. 105 at 46. In light of the parties' position and the Tenth Circuit's observation that the prima facie test is intended to be neither exacting nor rigid, *Frappied*, 966 F.3d at 1056, this Memorandum and Order applies the more general standard that the parties have identified.

legitimate, nondiscriminatory reasons. And Mitten has not met her burden of showing that those reasons are merely pretextual.

**1.** Mitten has sufficient evidence to satisfy the prima facie test. The parties do not seem to dispute that Mitten was a member of the class protected by the ADEA, that she suffered an adverse employment action, or that she was qualified for her position. Doc. 105 at 46. But Novartis claims that Mitten has not established that she was treated less favorably than those outside her protected class. To show less favorable treatment, Mitten must have presented facts to support that (i) Novartis punished employees differently for participating in the same scheme, and (ii) Novartis punished Mitten more severely than it punished her younger colleagues.

Mitten has shown that Novartis treated employees differently for participating in the same scheme as her. Novartis discovered five employees that violated Novartis's policies as part of the DelRosso scheme. Doc. 105 at ¶¶ 106–08; Doc. 110 at 26–27, ¶¶ 106–08. Three of them either retired or were terminated, including Mitten, Doc. 105 at ¶ 156; Doc. 110 at 38–39, ¶ 156, but the other two were only reprimanded and retrained, Doc. 105 at ¶¶ 153–54; Doc. 110 at 38, ¶¶ 153–54.[11] Novartis contends that the two who kept their jobs were not similarly situated because, in its view, their transgressions were less serious. Doc. 105 at 48. But that is irrelevant. To satisfy the prima facie test, Mitten need only establish differential punishment for participating in the same scheme.

As for more severe punishment for younger employees, it is undisputed that Mitten was terminated and that the two employees who were not terminated were younger than her. O'Brien was five years younger than Mitten and Reynolds was seventeen years younger. Doc. 105-1 at ¶ 45. Neither woman was terminated. Doc. 105 at ¶ 107. As stated above, Novartis's motivation for this differential treatment is irrelevant. Mitten has satisfied the prima facie test.

Novartis's only remaining argument at the prima facie stage is that Mitten has not established causation. Doc. 105 at 46–48. In other words, she has not shown that Novartis terminated her because of her age. But a plaintiff in an age discrimination suit need not show

---

[11] Mitten denies that Ms. Bower was terminated and contends that she retired early. Doc. 110 at 35–36, ¶ 156.

causation to satisfy the prima facie test. To be sure, Mitten must eventually show that Novartis would not have fired her but for her age. *Jones v. Okla. City Pub. Schs.*, 617 F.3d at 1277. And if Mitten were suing under a different theory, causation might well be part of the prima facie analysis. *See, e.g., Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1213 (10th Cir. 2003) (holding that causation is required to show a prima facie case of retaliation under the ADEA). But in an age discrimination suit, Mitten need not show causation yet.

**2.** Novartis has satisfied the second step of *McDonnell Douglas* for Mitten's age discrimination claim by adequately showing that its reasons for terminating Mitten were legitimate and nondiscriminatory. Specifically, Novartis argues that it terminated Mitten after a full and fair investigation into her misconduct, which revealed that she had violated several company policies. Doc. 105 at 52–53. It also explains the severity of Mitten's, DelRosso's, and Bower's discipline (as compared to Reynolds's and O'Brien's) by pointing out that the investigation and report found these three had engaged in more, and more serious, behavior than the others. *Id.* at 48. These constitute facially legitimate, nondiscriminatory reasons for Novartis's employment decisions. *See Salguero v. City of Clovis*, 366 F.3d 1168, 1175–76 (10th Cir. 2004) (listing as legitimate reasons for termination illegal activity and engaging in "more severe conduct" than other employees who were not terminated for their illegal behavior); *cf. Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1229–30 (10th Cir. 2000) (observing that gross insubordination was a facially valid reason to terminate an employee for purely disciplinary reasons). Therefore, Novartis has met its burden, which shifts back to Mitten.

**3.** Mitten has not met her burden to demonstrate that Novartis's proffered reasons were pretextual. To proceed to trial, she must offer evidence "to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason." *Jones*, 617 F.3d at 1280 (quoting *Bryant v. Farmers Ins. Exchange*, 432 F.3d 1114, 1125). Evidence of pretext is sufficient when it shows "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's reasons that "a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* (quoting *Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005)).

When applying this standard, courts may not "second guess the business judgment of the employer." *DePaula v. Easter Seals El Mirador*,

859 F.3d 957, 970 (10th Cir. 2017) (internal quotation marks omitted). That the employer "was mistaken or used poor business judgment" is not sufficient to show that the employer's explanation is unworthy of credibility. *Id.* at 970–71. Thus, a plaintiff must produce evidence that the employer did more than "get it wrong." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010). The evidence must indicate that the employer "didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda." *Id.*

Mitten proffers five reasons that Novartis's reasons for terminating her are merely pretextual. First, Novartis held her final interview differently from how it held those of her peers. Doc. 110 at 83. Second, Novartis used circumstantial evidence to evaluate her intent in emailing Mr. Dean. *Id.* at 68–69. Third, Novartis cited different company policies at different times to justify terminating Mitten. *Id.* at 71. Fourth, Novartis maintained a culture of undervaluing employees. *Id.* at 85. Fifth, Novartis treated other employees involved in the misconduct differently. *Id.* at 76–77. Mitten claims that these facts show Novartis's proffered reasons for her termination are false. But her arguments—both individually and cumulatively—are insufficiently supported and do not indicate that Novartis's reasons for firing her are mere pretexts to discrimination.

**a.** Mitten first claims that the interview Novartis held prior to her termination was a sham. Doc. 110 at 40, ¶ 6. Specifically, she argues that her peers were provided longer, fairer interviews before Novartis determined their discipline, whereas Mitten received a short, perfunctory interview aimed at confirming a decision that Novartis had already made. *Id.* at 67. But as Novartis points out, its investigation had already given it enough reason to fire Mitten prior to her interview. Doc. 105 at 34–35. The evidence establishes that Novartis had already made its decision to terminate her, *Id.* at ¶ 108, and, apparently, nothing that transpired during her interview caused it to reconsider, *Id.* at 37.

To support an inference of pretext, a plaintiff may show that an investigation into employee conduct is so lacking as to indicate bias or intentional unfairness. *Smother v. Solvay Chems., Inc.*, 740 F.3d 530, 542 (10th Cir. 2014). A plaintiff does not carry her burden of showing pretext merely by disagreeing with an employment practice or arguing her own view of fairness. *See EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011). It is irrelevant how things looked to the plaintiff; what matters is how the facts "appear[ed] to the people making the decision" at the time the decision was made. *Smother*, 740 F.3d at 543

(quoting *C.R. England, Inc.*, 644 F.3d at 1044) (cleaned up). For example, the Tenth Circuit has held that an investigation was pretextual because decisionmakers interviewed only a workplace accuser and not only declined to interview the accused but "even refused to allow him to talk" about the event at all. *Id.* at 542–43. But the court indicated that if the employer had simply allowed the accused to respond, then the employer's determination that one account was more credible than the other would not necessarily indicate pretext.[12] *C.R. England, Inc.*, 644 F.3d at 1044; *see also EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 488 (10th Cir. 2006).

Mitten's claim that the interview was a sham is only supported by evidence of her disagreement with Novartis's judgment. The record has established that Novartis collected information from all parties, determined which evidence to believe, and decided what action to take. *See* Doc. 105 at ¶¶ 58–160; Doc. 110 at 19–39, ¶¶ 58–160. After Bower implicated her, Mitten became a subject of the Business Practices Office and the Global Security Department's ongoing investigation. Doc. 105 at ¶ 90; Doc. 110 at 22, ¶ 90. That investigation included at least 16 interviews—including Mitten's own—and a search of DelRosso's, Bower's, and Mitten's work emails. Based on that alone, Novartis believed it needed to fire Mitten. Doc. 105 at ¶ 108; Doc. 110 at 26–27, ¶ 108. Nonetheless, it still allowed her to tell her story. While she might feel that she was not given a sufficient opportunity to tell her side of the story during her interview, the investigator asked her about the incriminating evidence provided by Bower and by her own email, some of which Mitten denied but other aspects of which she confirmed. Doc. 105 at 23–26, ¶¶ 120–142; Doc. 110 at 29–35, ¶¶ 120–142. She may disagree with how her interview was conducted or its fairness or efficacy, but there is no indication that either the interviewer or the ultimate decisionmakers thought that she had not violated company policy. In other words, she has not shown that the "facts as they

---

[12] This does not invite courts to engage in a due-process analysis or to sit in judgment on an employer's post-investigation determination. *See Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (observing courts are not a "super personnel department"). Instead, it simply asks whether there is a causal nexus between accusations motivated by bias and the ultimate decision: "[A]n employer can avoid liability by conducting an independent investigation of the allegations against an employee" because there "the employer has taken care not to rely" only on statements of a potentially biased accuser. *BCI Coca-Cola*, 450 F.3d at 488.

appear[ed] to the people making the decision" were suspect in any way. *See Smothers*, 740 F.3d at 543. And is irrelevant that the decision to terminate her had already been effectively made prior to her interview because Novartis did not make its decision on a mere whim. On the contrary, Novartis conducted hours of interviews with fifteen other people; searched her work emails; and coordinated investigation, reporting, and evaluation among three different Novartis entities. It even attempted to interview her during this investigation, but she was out on leave. This does not bear any of the hallmarks of a sham investigation.

**b.** Relatedly, Mitten claims that Novartis failed to investigate the "intent" behind her misconduct. *See, e.g.,* Doc. 110 at 72. That argument fails for the same reasons that Mitten's "sham interview" arguments fail—namely, that Novartis followed a thorough and independent investigation, then judged that there was sufficient evidence of her improper intent. And there is no evidence to suggest a causal connection between this determination and Mitten's protected status.

Mitten reasons that her intent is a necessary component of her alleged violations of the Global Anti-Bribery and Gifts Policy. Doc. 110 at 55, ¶¶ 84–86. She also argues that because Novartis had sponsored multiple Dr. DelRosso conferences and had encouraged representatives to invite healthcare providers to other Novartis events, it is clear that Mitten lacked any ill intent. *Id.* at 47, ¶¶ 39–40 & 49, ¶ 46. But neither Mitten's post hoc explanations of her conduct nor her contrary interpretations of Novartis's policies suggest that, at the time it acted, Novartis was insincere in its belief that Mitten had violated its policies.

And even if Mitten's intent were pertinent, it cuts against her position. She may have made no direct admission, but investigators and interviewers were able to reach conclusions about Mitten's intent from other evidence collected through computer searches and numerous interviews. It is not enough for Mitten to argue that their conclusion was erroneous in her eyes; she must demonstrate it was not genuine. *C.R. England*, 644 F.3d at 1044; *Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1535 (10th Cir. 1995). That, she has not done. Moreover, there is "no basis for concluding that an otherwise reasonable justification by an employer should be deemed pretextual merely because it is not directly reinforced by an official rule or policy." *C.R. England*, 644 F.3d at 1044–45; *see also Medlock v. United Parcel Serv., Inc.*, 608 F.3d 1185, 1192–93 (10th Cir. 2010).

**c.** Mitten also argues that the justification for her termination has been inconsistent, leading her to speculate that it is pure pretext. Doc. 110 at 69–73, 75. Specifically, at the time of Mitten's termination, Novartis relied on its conflicts policy and its Global Anti-Bribery and Gifts Policy. Then, many months into litigation, Novartis also began to claim that another policy, the US Anti-Bribery and Gifts Policy—which does not rely on intent to define certain violations—was a basis for Mitten's termination. But these reasonings are not inconsistent as Mitten alleges.

"Inconsistent reasons for terminat[ion]" can indicate pretext, where they are "so inconsistent and contradictory as to be unworthy of belief." *Foster v. Mt. Coal Co., LLC*, 830 F.3d 1178, 1194 (10th Cir. 2016). Thus, in a case where some employer witnesses testified that an employee was terminated because he lied about submitting a form, but others testified that the reason was inaccuracies contained in a later version of his form, that created a jury question on pretext. *Id.* But the Tenth Circuit has not said that just any inconsistency is sufficient evidence of pretext. Instead, when ruling that a reasonable jury could find "pretext when an employer provides one explanation for an adverse action but later affirmatively disclaims or otherwise abandons the rationale," it has also explained that "pretext cannot be established by the mere fact that the employer has offered different explanations for its decision." *Litzsinger v. Adams Cnty. Coroner's Office*, 25 F.4th 1280, 1291–92 (10th Cir. 2022) (cleaned up) (quoting *Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1311 (10th Cir. 2005)).[13]

Mitten's pretext argument fails here because the only variations she offers in Novartis's consistent explanations are coherent. The only reason Novartis has ever offered for its decision to terminate Mitten is her misconduct related to the DelRosso conferences. The identified policies that conduct may have violated have not always been identical, but they have been consistent. *Ramsey v. Labette Cnty. Med. Ctr.*, 297 F. App'x 730, 734 (10th Cir. 2008); *Heiman v. United Parcel Serv., Inc.*, 12 F.

---

[13] It seems Mitten's real complaint is not that the policy shifted from the one addressing global policy to one focused on domestic activities but rather on Novartis's failure to produce copies of its US policy until more than a year after discovery began. *See* Doc. 110 at 11–12. But even if so, her motion requests no relief for any implied discovery violations. And delinquent production would not bear on the legitimacy of Novartis's termination decision at the time it was made.

App'x 656, 666–67 (10th Cir. 2001); *cf. EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1044–45 (10th Cir. 2011) (recognizing employers are not required to tie their reasonable justifications to particular company policies). Mitten's evidence is insufficient to show pretext. *Litzsinger*, 25 F.4th at 1291–92.

**d.** Mitten also contends that supervisors asked when she planned to retire and that there was a culture of undervaluing older employees and forcing them out. Doc. 110 at 85. As to the company's culture, Mitten offers only inadmissible hearsay statements. These statements may not be considered during summary judgment. *See Johnson v. Weld Cnty.*, 594 F.3d 1202, 1210 (10th Cir. 2010). And as to the comments about Mitten's retirement, they might be interpreted as either innocent or invidious. Regardless, they were made by two individuals with no say in Mitten's termination long before that termination occurred. And "stray remarks" made "by non-decision makers are not material" to a pretext analysis. *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998); *see also LaChica v. Russell Stover Chocolates, LLC*, 853 F. App'x 283 at 287–88 (10th Cir. 2021).

**e.** Finally, Mitten claims she was subjected to differential treatment because other employees investigated for similar misconduct received lighter discipline than her. Specifically, she claims that instead of firing them, Novartis let DelRosso and Bower retire, Doc. 110 at 58, ¶¶ 115–116, and let Reynolds and O'Brien keep their jobs. *Id.* at 58, ¶ 114. She also points to the fact that Novartis has pursued its claim to recover incentive payments only from her and not from the other four employees. *Id.* at 59, ¶ 122. None of these arguments raises a question of fact about whether Novartis's reasons for firing Mitten were merely pretextual.

Mitten complains that DelRosso, who was four years younger than Mitten, Doc. 105-1 at ¶ 45, was allowed to retire rather than be terminated, Doc. 110 at 58, ¶ 115–116. Novartis claims it did not fire DelRosso because she had retired in the middle of the investigation, but it did designate her "no-rehire." Doc. 105 at ¶ 156–57. Mitten does not contest that DelRosso was designated no-rehire, Doc. 110 at 39, ¶ 157, nor that DelRosso forfeited benefits to retire mid-investigation, *id.* at 38–39, ¶ 156. Mitten only asserts the undisputed fact that DelRosso was not terminated, and she claims that the fact that she was not allowed to retire early as well is evidence of age-related differential treatment.

As to Bower, who was one year younger than Mitten, Doc. 105-1 at ¶ 45, Novartis asserts that it terminated her and did not allow her to retire, citing Bower's employee file, *see, e.g.*, Doc. 105 at ¶ 150. Mitten's attempt to controvert this fact does not raise a genuine dispute, as she relies only on a social invitation to a "retirement" party sent before Bower's termination. Doc. 110 at 38, ¶ 156; Doc. 118 at 23, 83.

Mitten's disputes as to both DelRosso's and Bower's experiences are immaterial. She does not argue that there is any scenario in which Bower or DelRosso would have been permitted to continue working had they not retired. Nor does Mitten allege that she requested and was denied the same opportunity to retire in lieu of termination. As a result of Bower, DelRosso, and Mitten's alleged misconduct, Novartis was unwilling to continue its relationship with any of them. That is no indication of pretext.

Reynolds and O'Brien, who were five and seventeen years younger, Doc. 105-1 at ¶ 45, received coaching and retraining and kept their jobs, Doc. 105 at ¶¶ 153–154; Doc. 110 at 38, ¶¶ 153–154; 58, ¶ 114. As to Reynolds and O'Brien, Mitten has pointed to no evidence in the record to show that the IRC had reason to doubt investigators' conclusion that they had engaged in lesser conduct than Mitten, DelRosso, and Bower.

Mitten also points out that Novartis did not sue to recoup incentive payments from any of the other four employees involved in the DelRosso scheme like it has done with her, despite its contractual right to do so. Doc. 110 at 59, ¶ 122. But that is of little consequence. First, Bower and Mitten were, for purposes of the ADEA, the same age. *See Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1060, 1166 (10th Cir. 2000). Second, Novartis did not affirmatively sue Mitten either. It filed counterclaims, based on the same incentive contracts, after Mitten involved Novartis in this litigation. *See* Fed. R. Civ. P. 13(a)(1) (indicating these were compulsory counterclaims once Mitten filed suit). All of these

alleged comparisons represent differences in circumstance,[14] not differences in treatment. *See, e.g., Medlock v. United Parcel Serv., Inc.*, 608 F.3d 1185, 1192 (10th Cir. 2010) (observing, where employer reinstated some employees but not others after termination for misconduct, that the reinstated employees' acceptance of responsibility and expressions of remorse fairly "distinguished [them] from [plaintiff]" and that there was no room for the court to "second-guess such business judgment in any event").

**f.** Even viewing these issues collectively does not aid Mitten because she is unable to create a question of fact about pretext. Although questions of intent and motivation are normally fact issues for a jury, plaintiffs must present evidence that would permit a reasonable jury to conclude that an employer's proffered reasons were not genuine. *McKnight*, 149 F.3d at 1129. "The test is good faith belief." *Id.* Where, as here, a plaintiff can point only to passing comments by non-decisionmakers and her own view that, "with the benefit of hindsight," the employer's decision "turned out to be poor business judgment" then the Tenth Circuit has concluded she simply has "no evidence" of pretext. *Id.* Novartis is entitled to summary judgment on Mitten's ADEA claims.

## C

Mitten asserts that she was terminated in violation of the ADAAA. Doc. 102 at ¶ 4.a. Novartis is entitled to summary judgment on this claim because Mitten has not produced evidence either to satisfy her prima facie burden or to create a question of fact on pretext.

---

[14] So, too, with Mitten's complaints that Novartis found DelRosso innocent of similar allegations in 2016. Doc. 110 at 42–46. At that time, Novartis received a tip that an employee named "Karyn" was engaging in misconduct. It launched an investigation but discovered no proof of misconduct and closed the matter. Mitten suggests that the investigation was thin, but the import of that suggestion is unclear. Moreover, unlike the 2018 tip, the 2016 allegations were not accompanied by any documentation or any suggestion that DelRosso had involved a network of other Novartis employees. Mitten acknowledges that "[e]vidence could not be found to support the allegation," which DelRosso denied at the time. Doc. 110 at 45, ¶ 28.

**1.** To make a prima facie case of discrimination under the ADAAA without direct evidence,[15] Mitten must show that she was a "disabled person," was qualified for the position held or desired, and "was discriminated against because of [her] disability." *Lincoln v. BNSF Ry. Co.,* 900 F.3d 1166, 1192 (10th Cir. 2018). The parties agree that Mitten was qualified for the role she held, but dispute whether she had a disability for purposes of the ADAAA and whether Novartis discriminated against her on that basis. Even assuming that Mitten has provided evidence that would satisfy the disability prong, she has no evidence that would allow a jury to infer that her disability was a consideration (much less a determining factor) in her termination. Thus, Mitten cannot make a prima facie case of disability discrimination.

**a.** The ADAAA defines "disability" to mean, "with respect to an individual-- (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1); *see also Skerce v. Torgeson Elec. Co.*, 852 F. App'x 357, 362 (10th Cir. 2021) (applying the amended definition). A physical or mental impairment under subpart (A) does not require permanence, and EEOC regulations make clear that "impairment[s] lasting or expected to last fewer than six months can be substantially limiting" for the purposes of proving an actual disability. 29 C.F.R. § 1630.2(j)(1)(ix); *see also Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 329 (4th Cir. 2014). Those same regulations counsel that the term "substantially limits" should be "construed broadly in favor of expansive coverage" and should not be viewed as a "demanding standard." 29 C.F.R. § 1630.2(j)(1)(i).

---

[15] Mitten lacks direct evidence of disability discrimination. She acknowledges that temporal proximity alone is not direct evidence. Doc. 110 at 83; *see also Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1001 (10th Cir. 2011). But she argues that Novartis's recommendation of her termination prior to an interview is sufficiently direct evidence because it "cannot be construed any other way and is not subject to inference." Doc. 110 at 83. She is incorrect. Even if the decision can be construed as one to terminate Mitten without legitimate reason, it can just as easily be construed as a preliminary decision consistent with the results of a misconduct investigation. The situation is not conclusive in Mitten's favor and is not direct evidence. *Riggs*, 497 F.3d at 1117; *Twigg*, 659 F.3d at 1001.

Mitten cannot show any ongoing impairment after she returned to work—full time, in her normal duties, without restrictions—on August 20, 2018. Despite her argument that she was terminated before she had time to learn of any difficulties, Mitten provides no evidence of difficulties in her daily activities in the four years since her termination. In fact, the only item she offers to support a limitation after August 20 is hearsay: Mitten asserts, via declaration, that her doctor told her she might qualify for permanent disability. This statement, offered for its truth, is the type of hearsay testimony that Mitten would not be permitted to offer at trial and "may not be included in an affidavit to defeat summary judgment." *Thomas v. Int'l Bus. Machines*, 48 F.3d 478, 485 (10th Cir. 1995); *see also Johnson v. Weld Cnty.*, 594 F.3d 1202, 1210 (10th Cir. 2010). Thus, Mitten has not shown that she had a substantial limitation *after* she returned to work without restrictions.

But Mitten has arguably satisfied her light prima facie burden by establishing that Novartis made the termination decision on August 9, 2018, while she was still on complete leave for a broken bone. Temporary limitations can satisfy the ADAAA's "actual disability" definition, 29 C.F.R. § 1630.2(j)(ix); *Skerce*, 852 F. App'x at 362, and it is undisputed that from March 2018 to August 2018 Mitten was on complete, though temporary, leave because of that injury. Given that the ability to work is a "major life activity," 29 C.F.R. § 1630.2(i)(1), Mitten can show she had an actual disability—as defined in the ADAAA—during that period. Thus, a reasonable jury could find that the timing of Novartis's effective decision was as early as August 9 or as late as August 21, 2018. And the record could support a finding that on August 9 Mitten had an actual substantial impairment that placed her in an ADAAA-protected class.

**b.** But Mitten has not pointed to "circumstances surrounding the adverse employment action [that] give rise to an inference that the action was based on the plaintiff's disability." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192–93 (10th Cir. 2018) (quoting *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 544 (10th Cir. 2014)) (cleaned up). The only evidence Mitten identifies is the temporal proximity between her disability leave and Novartis's decision to terminate her. Doc. 110 at 66–67. While "very closely connected" timing alone can satisfy this element of a prima facie *retaliation* case, and timing is undoubtedly important in determining intent, there is no indication that timing alone will satisfy the prima facie standard on a discrimination claim. *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); *Trujillo v.*

*PacifiCorp*, 524 F.3d 1149, 1157 n.5 (10th Cir. 2008). Mitten's only citation to the contrary is an FMLA case, wherein the plaintiff was proceeding not on a theory of discrimination, or even retaliation, but of FMLA interference. *See DeFreitas v. Horizon Inv. Mgmt. Corp.*, 577 F.3d 1151, 1160 (10th Cir. 2009). Thus, while close temporal proximity is a factor to "be given considerable weight," when a discrimination plaintiff can identify no other evidence to support an inference of improper motivation, she has failed to explain why it alone will suffice in the discrimination context. *Id.* at 1157–58.

**2.** Even if timing alone would satisfy her prima facie burden, Mitten's evidence fails to satisfy the pretext burden for the same reasons discussed in the ADEA context. The evidence—for both Mitten and Novartis—is practically the same. That is fatal to Mitten's claim.

Mitten has not presented evidence to support a conclusion that any of the other employees were not disabled under the ADAAA. She alleges several times that they were able-bodied, *see, e.g.,* Doc. 110 at 23, ¶ 94, but she did not provide evidence that would support that legal conclusion. And allegations alone are not enough to oppose summary judgment—those allegations must be supported by facts in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). And the facts in the record indicate that at least one employee, DelRosso, took a short-term disability leave soon after Mitten did. Doc. 105 at ¶ 83; Doc. 110 at 22, ¶ 83. Mitten alleges that DelRosso received more favorable treatment because she was allowed to retire voluntarily. Doc. 110 at 58, ¶ 115. So the scant evidence in the record cuts against Mitten's argument that the other employees were both able-bodied and treated better on that basis.

There is no evidence that would permit a reasonable jury to find that Novartis's reasons for terminating Mitten were mere pretext for disability discrimination. Novartis is entitled to judgment in its favor.

### III

Mitten has alleged employment discrimination under both the ADEA and the ADAAA. She has not raised a genuine issue of material fact on either of these causes of action. She has not made a valid prima facie case for her ADAAA claim, and she has not adequately supported her ADEA claim by showing Novartis's claimed reasons for terminating her are mere pretext for age discrimination. For these reasons,

Novartis's motion for summary judgment as to Mitten's claims, Doc. 104, is GRANTED.

It is so ordered.


Date: August 19, 2022          s/ Toby Crouse
                              Toby Crouse
                              United States District Judge